STATE, Plaintiff-Respondent, v. HARRIS,
Defendant-Appellant.†

Court of Appeals

*No. 79–848–CR. Submitted on briefs September 24, 1979.—
Decided October 24, 1979.*
(Also reported in 285 N.W.2d 917.)

---

† Petition to review pending. This petition was not decided at the time the volume went to press. Its disposition will be reported in a later volume.

For the appellant, the cause was submitted on the briefs of *Richard L. Cates,* state public defender, with whom on the brief was *Mark Lukoff,* first assistant state public defender.

For the respondent, the cause was submitted on the brief of *Bronson. C. La Follette,* attorney general, with whom on the brief was *Michael R. Klos,* assistant attorney general.

Before Decker, C.J., Moser, P.J., and Cannon, J.

MOSER, P.J. Jeffrey Lee Harris (Harris) appeals from a judgment of conviction entered on November 30, 1978, following a jury trial. He was convicted of one count of armed robbery, party to a crime (PTAC), contrary to secs. 943.32(1)(b) and 939.05, Stats.; one count of first-degree sexual assault, PTAC, contrary to secs. 940.225(1)(b) and 939.05; one count of second-degree sexual assault, PTAC, contrary to secs. 940.225(2)(b), and 939.05; and two counts of kidnapping, PTAC, contrary to secs. 940.31(1)(b) and 939.05. He was sentenced to thirty years, fifteen years and ten years on the

first three counts respectively, and fifteen years on each count of kidnapping. Concurrent sentences were imposed on the various counts named, but the concurrent sentences were to run consecutive to a previous life sentence for murder in the first degree.

Harris also appeals an order entered June 4, 1979, denying his postconviction motions.

The complaint was filed on September 27, 1977. Lawrence Bivens (Bivens), Harris' accomplice, pleaded guilty to charges arising from the same events on February 14, 1978. Harris' trial on these charges commenced October 9, 1978.

The testimony presented by the state established that on August 19, 1977, at approximately 11:30 p.m., the victims of the crimes, Julia Pittman (Pittman) and Sandra Miller (Miller), left the Skyway Lounge in Milwaukee and walked toward Pittman's car, which was parked in an adjacent lot. Harris approached Pittman and asked her if she was driving south. Pittman responded that she was not. As Pittman was unlocking the driver's door, Harris advanced with a gun, poked it in her side, and ordered her to get inside. Miller, who was standing on the opposite side of the car, noticed that Harris had a companion, Bivens, who was now standing immediately behind her. Harris ordered Miller to get into the car.

Pittman got into the driver's seat, Miller in the front passenger seat, and Harris and Bivens in the back seat of the car. Harris told Pittman and Miller to hand their purses back, which the two women did. Money was taken from the two purses as well as jewelry from Miller. Harris ordered Pittman to start the car and eventually, at his direction, the car was driven to a vacant lot. Miller testified that she glanced back during the ride and saw that Harris was still brandishing a gun. Harris told the two women that he had killed a policeman earlier that evening and that "he had nothing to lose."

At the vacant lot, Harris ordered Pittman from the car, told her to remove her clothing, and had sexual intercourse with her. Pittman testified that Harris held a gun to her head and told her that he would kill her if she resisted. Harris' companion, Bivens, forced Miller out of the car at gunpoint and had sexual intercourse with her. After the initial acts of intercourse were completed, Bivens went over to where Pittman was lying on the ground and had sexual relations with her. Harris approached Miller and ordered her to perform oral sex. When Miller refused, he threatened to blow her head off. Neither the request nor the threat were performed.

Bivens, who had confiscated the keys to Pittman's car, took control of the wheel when the four people returned to the car. Bivens drove the car to Harris' residence and then to his own residence to pick up some clothing. After a stop at a gas station, the car driven by Bivens headed for Chicago, Illinois. On the trip to Chicago, Miller pleaded with the two men to release them. Harris responded by hitting Miller on the back of the head with a gun.

Harris and Bivens told the two women that they were going to stop in Chicago to pick up some money. Bivens drove the car to an apartment in a housing project leased by his sister, Lois Guyton (Guyton). Harris instructed the two women not to talk to Guyton because he didn't want to shoot with children around. At the apartment, the women learned the names of their abductors.

After a short stay in the apartment, the two women testified that they returned to the car with Harris and Bivens for a trip to an unknown destination described as "east on Interstate 55." Miller asked for her asthma medicine which was in her purse. The purse had been placed in the trunk of the car before the trip to Chicago. Bivens got the medicine from the purse and, in the process, locked the car keys inside the trunk. The two women were sitting inside the car while Harris and Bivens were

occupied with attempts to open the locked trunk of the car. Pittman got Guyton's attention and motioned her to come over to the car. Pittman told Guyton that they had been kidnapped and raped and that the two men had guns.

Guyton told the two women to get out of the car and walk with her to the apartment where the two children were standing. Guyton told Harris that she was taking the two women back to the apartment to get some coffee and aspirin. The trio of women had almost made it to the apartment entrance when Harris shouted for them to stop or he would blow their heads off. Guyton told Harris not to shoot with the children present. Pittman and Miller ran into the apartment entrance, through the lobby and into another building. They were admitted into another apartment and called the police. Miller was subsequently treated at a Chicago hospital for bruises to the back of her head.

Guyton testified at Harris' trial and substantially confirmed the testimony of Pittman and Miller. Guyton identified Harris and stated that she had known him since he was a teenager. Guyton testified that the other male who accompanied the defendant and two women was her brother, Lawrence Bivens.

According to Guyton, the four people arrived at her apartment at approximately 4 a.m. on August 20, 1977. The two women were introduced as Julia and Sandra.

Guyton confirmed the testimony of Pittman and Miller that the car keys were locked in the trunk of the car while the four people were making preparations to leave. While Harris and Bivens were attempting to get the keys out of the car trunk, one of the women motioned her to the side of the car and told her that they had been kidnapped and raped. They also told her that Harris had a gun. Guyton told the two women to get out of the car and walk with her to the apartment. She told Harris that she was taking them back to the apartment for cof-

fee and aspirin. The defendant shouted, "get back in the car before I shoot you." Guyton warned Harris that two children were standing there, and at that point, Pittman and Miller ran into the apartment building and escaped. Guyton stated that she observed a gun in Harris' possession when the two men came back to her apartment after Pittman and Miller had escaped.

After the close of the state's case Harris called Bivens as his witness. As stated above, Bivens had previously pleaded guilty and been sentenced for his participation in the acts for which Harris was being tried. Harris' trial counsel advised the trial court that Bivens would take advantage of his Fifth Amendment privilege not to testify, and that he should first testify outside of the presence of the jury. Harris' trial counsel also advised the trial court that Bivens' trial attorney, Mr. Lebell, wanted to be in court when Bivens testified. The court recessed to accommodate Mr. Lebell. After the recess, with attorney Lebell present, the record reflects that the following events took place outside the presence of the jury:

### EXAMINATION BY THE COURT

Q  Mr. Bivens, you stated your name on the record?
A  Yes.
Q  And is it your intention to testify here today?
A  Yeah. The only thing I have to say is Mr. Harris wasn't with me. He didn't have anything to do with this. He didn't have nothing to do with it. He wasn't with me. That's all I have to say. If I say anything else, it's damaging to my case if I'm on appeal. I'm pleading the Fifth.
   MR. LEBELL: At this point, I recommend you remain silent.

The court admonished Bivens that he had conferred with Mr. Lebell and that witnesses have to answer all questions put to them under the contempt powers of the court unless they take advantage of their Fifth Amend-

ment rights or are given immunity. Lebell asked for a recess to confer with Bivens. After the brief recess, Lebell stated on the record:

MR. LEBELL: I have advised Mr. Bivens as his lawyer that he has the right to remain silent and exercise his Fifth Amendment right not to testify. He advised me earlier, his case was under appeal prior to today's date. He has contacted another person for an appellate procedure and anticipates further appeal. It's my advice to him now to exercise his Fifth Amendment privilege and not testify regarding the matter.

The court then stated to Bivens:

THE COURT: This is a personal privilege and a personal privilege only. It's up to you and no other person to determine whether or not you are going to give testimony in this case or whether you are going to elect not to testify on the grounds that your answers may tend to incriminate you under the provisions of the Constitution, of the United States Constitution and the Constitution of the State of Wisconsin. I have heard your attorney. He has talked to you. You have had time to give it full consideration.

I'm ready at this time to call the jury out and have them hear whatever you wish to say, however, are you going to choose not to testify on the grounds that your answers may tend to incriminate you?

BIVENS: I wish to leave the stand.

After admonishing Bivens that that answer wasn't responsive, the court stated:

THE COURT: Mr. Bivens, you are free to make your own determination in this matter, but I want it clear and on the record, and you're going to have to do it. I'm not going to do it for you and your attorney can't do it for you. I will require you to make an election now whether you are going to give testimony in this case or whether you personally are going to ask the court or direct the court that you refuse to answer questions on the grounds that your answers may tend to incriminate you.

BIVENS: I don't wish to testify.

THE COURT: On what grounds?

BIVENS: Under the Constitution, the Fifth Amendment.

THE COURT: I'll construe that to be the claim for his constitutional right not to give testimony.

A short time later, Harris' counsel asked the district attorney to request immunity for Bivens. The district attorney refused. Finally the trial court stated:

THE COURT: Under these circumstances, the Court has no alternative but to excuse Mr. Bivens from the witness stand. His testimony will not be received before the jury. His response is that he refuses to testify on the ground that any questioning may tend to incriminate him based upon the Fifty [*sic*] Amendment. In view of the fact that this witness has conferred with his counsel and in view of the other circumstances which the State has abiding interest in the prosecution of Mr. Bivens which is still under appeal and consequently does not choose to move the court to grant immunity to Mr. Bivens, Mr. Bivens you are excused. You are remanded into the custody of the sheriff to be returned to the institution where you came from when you were subpoenaed by subpoena duces tecum.

Harris produced no further evidence. On October 12, 1978, the jury returned with the guilty verdicts and the trial court granted judgment on the verdict. Harris was committed to the Department of Health and Social Services pursuant to sec. 975.06, Stats. and on November 30 he was returned to the trial court and sentenced.

On March 5, 1979, Harris filed a postconviction motion for a new trial. The motion was heard by the trial court on March 12 and later denied under sec. 809.30(1)(g), Stats. The order denying the motion was entered on June 4.

Attached to the motion were documents which noted:

1. On February 14, 1978, Bivens pleaded guilty and was convicted and sentenced on three charges arising out of the same events Harris was charged with.
2. A letter from the deputy clerk of the Wisconsin Supreme Court dated February 22, 1979, which stated

that Bivens had filed no notice of appeal or no writs of error were issued on behalf of Bivens.

3. A letter from the United States Attorney for the Eastern District of Wisconsin dated February 22, 1979, which stated that a charge of unlawful flight to avoid prosecution against Bivens was dismissed in October, 1977; attached was a copy of the dismissal order.

4. A letter dated March 6, 1979, from the United States Attorney's office for the Northern District of Illinois stating there were no charges brought against Bivens growing out of the events which took place on or about August 20, 1977.

The issue on this appeal is whether Harris was denied his Sixth Amendment right to compulsory process by virtue of Bivens' refusal to testify. Harris argues that the trial court committed clear error in allowing Bivens to claim the Fifth Amendment.

Where a defendant demands testimony from an alleged conspirator, there is the potential clash of the constitutional protection against self-incrimination and the constitutional right to compulsory process.

An accused's right to compulsory process[1] is incorporated in the due process clause and applies equally in federal as well as state cases.[2] Few rights are more fundamental than that of an accused to present witnesses in his own defense.[3]

On the other hand, no person can be forced to give self-incriminating testimony.[4] The trial court has a clear

---

[1] U.S. Const. Amend. VI; Wis. Const. art. I, §7.

[2] *Washington v. Texas*, 388 U.S. 14, 17–19 (1967); *State v. Groppi*, 41 Wis.2d 312, 322, 164 N.W.2d 266, 271 (1969).

[3] *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).

[4] U.S. Const. Amend. V; Wis. Const. art. I, §8.

responsibility to make a full record[5] that the witness' fear of incrimination is valid, real and appreciable, and not speculative or merely an imaginary possibility of incriminatory danger.[6] In all cases where witnesses have a valid, real and appreciable right to refuse to testify, courts must favor that right over the conflicting right to compulsory process.

Normally, a person who pleads guilty to a federal or state offense simultaneously waives his privilege against self-incrimination.[7] Exceptions to that general rule have been recognized where the person appeals from the conviction arising from the guilty plea,[8] or where he/she is subject to related charges stemming from the same incidents.[9]

Here, Harris claims that Bivens waived his privilege against self-incrimination by admitting the truth of the underlying facts giving rise to his claim of privilege through his guilty plea. Furthermore, Harris claims that Bivens had not, at the time of his claim of privilege, and did not subsequently appeal his conviction. Therefore, he argues the trial court committed clear error in not investigating whether an appeal was pending, and in allowing Bivens to claim the Fifth Amendment privilege. Harris concludes that he was unjustifiably denied his right to have Bivens testify in his defense; testimony

[5] *State v. Blake*, 46 Wis.2d 386, 389–92, 175 N.W.2d 210, 212–13 (1970); *U.S. v. Johnson*, 488 F.2d 1206, 1211 (1st Cir., 1973); 8 Wigmore, *Evidence* §2271, p. 420 (McNaughton rev. ed., 1961).

[6] *Mason v. United States*, 244 U.S. 362, 365–66 (1917); *In re Grant*, 83 Wis.2d 77, 82, 264 N.W.2d 587, 591 (1978).

[7] *McCarthy v. United States*, 394 U.S. 459, 466 (1969); *Hanneman v. State*, 50 Wis.2d 689, 692, 184 N.W.2d 896, 897 (1971).

[8] *Holsen v. United States*, 392 F.2d 292, 293 (5th Cir. 1968); *People v. Lindsay*, 69 Mich. App. 720, 723, 245 N.W.2d 343, 344 (1976); 971.08(3).

[9] *U.S. v. Johnson*, *supra* note 5, at 1209–10.

which he claims could have convinced the jury of his innocence.

We disagree. This is a case where hindsight is better than foresight. The record is clear that at the trial Harris, his counsel, the district attorney, Bivens' counsel, and the court were all convinced by the extensive hearing record concerning Bivens' exercise of the Fifth Amendment rights that an appeal was pending.

Bivens' equivocal statement, after conferring with his attorney, "[i]f I say anything else, it's damaging to my case if I'm on appeal. I'm pleading the Fifth," coupled with Bivens' attorney's immediate admonishment "[a]t this point, I recommend you remain silent" which was further supplemented with the statement to the trial court that he advised Bivens to take advantage of the Fifth Amendment privilege since his case was on appeal with the assistance of other counsel, all supported the trial court's conclusion that the case was on appeal.

It is true that no appeal was then filed nor was subsequently filed. However, the defendant was obligated to bring those facts to the trial court's attention. Trial courts are not investigators. To place an investigative burden on them would force courts in like situations to recess the trial and search through courthouse and appellate records to verify appeal statements. That is simply not practical, and could work havoc on the proper administration of the courts. Moreover, there would be no record for appellate review of what the trial court had done. In this case, it is the defendant who will benefit by the revelation of such facts, and therefore the defendant must assume the burden of the search.

Presumably, Bivens would have filed a motion to withdraw his guilty plea under sec. 971.08(2), Stats., prior to appealing. The recent Wisconsin case of *State v. Lee*[10]

[10] 88 Wis.2d 239, 246, 276 N.W.2d 268, 271 (1979).

has recognized that sec. 971.08(2), Stats., which allows a defendant 120 days from conviction to withdraw a guilty plea, is regulatory and not jurisdictional. Under *Lee*, a defendant has at least one full year from conviction to withdraw his plead. Although it would normally be an abuse of discretion to grant a withdrawal beyond that period, in exceptional circumstances that period could be extended. Since a defendant's Fifth Amendment claim is preserved by a notice of appeal, it necessarily follows that the constitutional claim may also be preserved by postconviction proceedings filed in the trial court prior to or in anticipation of appeal. To require a defendant such as Bivens in this situation to concede his Fifth Amendment privilege might undermine his ability to claim on a motion to withdraw his plea that, for example, his plea was not voluntarily or intelligently based upon actual facts.[11]

In this case, Bivens still had three full months under *State v. Lee* in which to withdraw his plea, and could also appeal from a trial court's denial of that motion.[12] At least during that first year, while a defendant who has previously pleaded guilty and been convicted on such plea still has a common law right to withdraw his plea, his good faith expression of an intent to do so provides a valid, real and appreciable basis for the claim of Fifth Amendment privilege.[13] To hold otherwise could effec-

---

[11] *State v. Reppin*, 35 Wis.2d 377, 386, 151 N.W.2d 9, 14 (1967).

[12] *See e.g., State v. Lee, supra* note 10; *Spinella v. State*, 85 Wis.2d 494, 498, 271 N.W.2d 91, 93 (1978).

[13] *Holsen, supra* note 8, at 293 (privilege upheld where witness "in the process" of appealing conviction); *People v. Lindsay, supra* note 8, at 344 (privilege upheld where witness "was appealing" his guilty plea conviction); *People v. Den Uyl*, 318 Mich. 645, 648, 29 N.W.2d 284, 286 (1947) (privilege upheld where witness' writ of certiorari still pending with the United States Supreme Court); *People v. Smith*, 34 Mich. App. 205, 210–11, 191 N.W.2d 392, 394 (1971) (privilege upheld where witness convicted

tively shorten the one year period under *State v. Lee* so that a codefendant such as Bivens would have to make his motion to withdraw his plea prior to defendant Harris' trial.

The Fifth Amendment protection is personal to the person claiming it. Although the trial court must finally determine whether a defendant's, such as Bivens, claim is justified, the court must defer to the privilege where there is a valid, real and appreciable chance of incrimination.[14] Here, both Bivens and attorney Lebell expressed that there was an appeal. Although their expression of appeal prematurely anticipated a denial of their motion to withdraw the plea, it indicated an intent to vitiate the plea. Based upon the record, this court cannot say that the trial court's finding that Bivens had a valid reason to avail himself of the Fifth Amendment privileges was against the great weight and clear preponderance of the evidence. Though Harris' counsel, the district attorney, Bivens' counsel, and the court were mistaken in their belief that an appeal was pending, there still existed a sufficient basis for the claim of Fifth Amendment privilege.

In fact situations such as presented here where there is a clash of freedom from incrimination rights as opposed to compulsory process rights, trial courts do not commit error in favoring the protection of the freedom from incrimination right when they make a complete record as was done here. This trial record clearly established that at the time of Bivens' testimony, Bivens es-

---

but could still withdraw his plea or prosecute an appeal). *See generally* Annotation, Plea of Guilty or Conviction as Resulting in Loss of Privilege Against Self-Incrimination as to Crime in Question, 9 A.L.R.3d 990.

[14] *Grant, supra* note 6, at 82, 264 N.W.2d at 591.

tablished that there was a valid, real and appreciable right to refuse to testify.

Even assuming that there was error, it was harmless in this case. The brief testimony of Bivens that Harris had "nothing to do with" the crime, is patently incredible in light of the overwhelming testimony from Guyton (Bivens' sister) and the two victims that Harris was one of the two perpetrators. Though if error was committed, it was of constitutional magnitude, this court finds it to be harmless beyond a reasonable doubt.[15]

*By the Court.*—Judgment and order affirmed.

[15] *Sheehan v. State,* 65 Wis.2d 757, 767, 223 N.W.2d 600, 605 (1974).

